## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

**LAURETTA HENRY**, as Personal
Representative for the Estate of
**JAMES HENRY,** Individually,

        Plaintiff,

**v.**

**MEIJER STORES LIMITED PARTNERSHIP**,
a Domestic Limited Partnership; **MEIJER, INC.**, a
Domestic Profit Corporation; and **MEIJER
DISTRIBUTION, INC**., a Domestic Profit
Corporation,

        Defendants.

CASE NO.

**JURY DEMAND**

---

## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff, Lauretta Henry, as the Personal Representative of the Estate of James Henry,
deceased, by and through her undersigned counsel, hereby brings this action and complaint for
damages and demand for jury trial against Defendants, Meijer Stores Limited Partnership, Meijer
Inc., and Meijer Distribution, Inc. (hereinafter collectively referred to as "Defendants" or
"Meijer") and in support thereof, alleges as follows:

## INTRODUCTION

1.     This is an employment discrimination action alleging claims for racial
harassment, discrimination, and retaliation in violation of 42 U.S.C. § 1981 ("Section 1981") and
the Elliott-Larsen Civil Rights Act ("ELCRA"), MCL § 37.2101, *et seq* and for Intentional
Infliction of Emotional Distress ("IIED") and Negligent Infliction of Emotional Distress
("NIED").

## PARTIES

2.      Plaintiff, Lauretta Henry, Personal Representative of the estate of James Henry, is a resident of the state of Michigan.

3.      James Henry (deceased) was a resident of the state of Michigan.

4.      At all times material hereto, Mr. Henry was an "employee" of Meijer within the meaning of Section 1981 and the ELCRA.

5.      Defendant, Meijer Stores Limited Partnership is a Domestic Limited Partnership in Michigan.

6.      Defendant, Meijer, Inc. is a Domestic Profit Corporation in Michigan.

7.      Defendant, Meijer Distribution, Inc. is a Domestic Profit Corporation in Michigan.

8.      Meijer Stores Limited Partnership meets all of the requirements for employer status under the ELCRA.

9.      Meijer, Inc. meets all of the requirements for employer status under the ELCRA.

10.     Meijer Distribution, Inc. meets all of the requirements for employer status under the ELCRA.

11.     Defendants are *de facto* the same company.

12.     Defendants are a single and/or joint employer and/or integrated enterprise.

## JURISDICTION

13.      This Court has original jurisdiction over Plaintiff's Section 1981 claims pursuant to 28 U.S.C. §§ 1331.

14.     The Court has supplemental jurisdiction over Plaintiff's ELCRA, IIED, and NIED claims pursuant to 28 U.S.C. § 1367 as these claims are so related to Plaintiff's Section 1981 claims that they form part of the same case or controversy.

15.     Jurisdiction to grant injunctive and declaratory equitable relief as well as damages is invoked pursuant to the statutes cited above as well as *Ex Parte Young*, 209 U.S. 123 (1908) pursuant to Plaintiff's request for prospective injunctive relief, and the authority to grant declaratory relief under the statutes cited above.

## VENUE

16.     Venue is proper in this Court pursuant to 28 U.S.C. §1391 because a substantial part of the events or omissions giving rise to the claims occurred within the Southern Division of the Western District of Michigan.

17.     Defendants conduct substantial and not isolated business within the Southern Division of the Western District of Michigan.

18.     Defendants have agents and employees in the Southern Division of the Western District of Michigan.

19.     Defendants have businesses located in the Southern Division of the Western District of Michigan.

## FACTUAL BACKGROUND

20.     Mr. Henry began his employment with Defendants in approximately December 2000 as a warehouse clerk at the Meijer Distribution Facility in Lansing, Michigan.

21.     In approximately April 2017, Mr. Henry was promoted to Maintenance Apprentice-Level 2 position, and transferred to work at a different department with a different set of employees.

22.     Meijer's Maintenance Apprentices required training from Level 3 technicians.

23.     During his apprenticeship, Mr. Henry was required to take classes and on-site training to obtain certification as a mechanic.

24.     This prospective promotion to a Level 3 technician would have entitled him to an

increase of compensation to $31 per hour.

25.     Mr. Henry strived to be a certified mechanic.

26.     During his apprenticeship, Mr. Henry was the only African American apprentice required to be trained by Level 3 technicians.

27.     During his apprenticeship, Mr. Henry was subjected to severe racial discrimination and harassment by individuals assigned to train him, which includes Roger Carter and Robert Bullard.

28.     In approximately June 2017, Mr. Henry complained of the race discrimination, harassment, and hostile work environment he was made to endure to his supervisor, Tayyar Pektunus, with his union steward, Jason Palomba.

29.     Meijer's own policies and procedure permit employees to make race discrimination, harassment, and hostile work environment complaints to "any leader," which includes supervisors.

30.     Meijer's own policies and procedure permit employees to make race discrimination, harassment, and hostile work environment complaints to "any leader," which includes union stewards.

31.     Mr. Henry advised Mr. Pektunus that he was harassed because of his race, that his trainers refused to properly train him, and that he did not want to be discriminated against and get kicked out of the apprenticeship program.

32.     Meijer's own policies and procedures promises that it "promptly investigate and resolve any inappropriate behavior that is reported."

33.     Meijer's own policies and procedures promises that "[t]he company will investigate all complaints in a timely manner, and undertake appropriate remedial action."

34.     Defendants did not conduct an investigation for race discrimination, harassment, and/or hostile work environment for Mr. Henry in June 2017.

35.     Defendants did not take any actions in response to Mr. Henry's June 2017 complaint.

36.     Instead, Mr. Pektunus advised Mr. Henry that all mechanics were like this and he needs to "grow a pair of nuts."

37.     Mr. Pektunus' June 27, 2017 correspondence confirms that on June 23, 2017, Mr. Henry "mentioned that he did not want to be discriminated against . . . "

38.     In August 2017, AJ Harris, Meijer employee, instructed Mr. Henry to go into a truck with him for a ride during his work shift, and Mr. Henry agreed.

39.     When he entered the truck, Mr. Henry saw a **noose hanging in the rear view mirror of the truck**.

40.     Mr. Henry took a picture of the noose, which is attached as **Exhibit A**.

41.     The display of a noose to an African-American is inherently discriminatory and harassing based on their race.

42.      The display of a noose to an African-American is an act of terror designed to spread fear and panic amongst African Americans for the purpose of portraying white supremacy.

43.     Indeed, "[t]**he effect of such violence on the psyche of African Americans cannot be exaggerated.** Sociologists have explained that 'lynching was employed to maintain dominance whenever it suited whites to reaffirm their mastery or blacks challenged or seemed about to test the established contours of their subordination." *Williams v. New York City Hous. Auth.,* 154 F. Supp. 2d 820, 824 (S.D.N.Y. 2001) citing Robert L. Zangrando, *The NAACP*

*Crusade Against Lynching, 1909–1950* 4, 9 (1980) (emphasis added).

44.     Mr. Henry was baffled and fearful for his safety after seeing the noose.

45.     Paralyzed by fear, Mr. Henry did not immediately report this incident to his supervisors because of Meijer's initial response to his prior complaint, which Meijer's summarily dismissed and Mr. Henry was advised to "grow a pair of nuts."

46.     Mr. Henry remained emotionally crippled, silent and terrified for months after discovering the noose in the truck.

47.     In the interim, Mr. Henry's trainers continued to refuse to train him to become a Level 3 technician.

48.     During that time, the harassment continued to escalate, where a co-worker made a reference to a "**slave driver**" in the presence of Mr. Henry.

49.     For months, Mr. Henry complained about the race discrimination and the noose incident to his co-workers, Gary Jones, Luis Gonzales, Jerome Houston, and Hugh Ramsey.

50.     Mr. Henry showed up to work every day enduring isolation and humiliation.

51.     Mr. Henry suffered from epilepsy, which is triggered by stress.

52.     Mr. Henry's stress and anxiety continuously increased due to the racist hostile work environment he was made to endure at Meijer, which triggered his epilepsy.

53.     As a result, Mr. Henry went on medical leave from April to October 2018 because of stress induced epileptic seizures.

54.     In October 2018, Mr. Henry returned from his medical leave.

55.     At that time, Meijer retaliated against Mr. Henry, and moved him to work in the cold storage to hang up netting.

56.     Mr. Henry's co-workers continued their harassment towards him.

57.    In November 2018, Mr. Henry could no longer endure Meijer's harassment, and submitted a second formal discrimination complaint to his supervisor.

58.    Mr. Henry complained of the harassment he was made to endure to his Unit Director, Mike Sontag.

59.    Again, Meijer failed to take effective remedial measures, or investigate Mr. Henry's complaint.

60.    Thereafter, Mr. Henry objected to the harassment to James Kushner, Meijer's maintenance supervisor.

61.    Again, Meijer failed to take effective remedial measures, or investigate Mr. Henry's complaint.

62.    After this incident, none of the maintenance workers spoke to Mr. Henry.

63.    On November 8, 2018, Mr. Henry reiterated his previously submitted complaint to Meijer's Maintenance Supervisor, Robert Ellsworth, in an email correspondence, which states in relevant part:

> Finally had it with being treated differently than all the other mechanics and went to the office with Jeff and talked to Mike Sontag about it. I'm trying to learn as much as I can about this job and for some reason it's very hard for me to get treated with dignity and respect like the other mechanics. These guys all talk to each other perfectly fine but for some odd reason if I ask a question or say what they get hostile. The other mechanic Robert says that they put me over here as his punishment. I see these guys laughing and joking with eachother [sic] and when it comes to me they change. They called James over yesterday and he handled the situation already but Mike Sontag told me to let you know anyway. Sorry to bother you with this crap but I believe I am being discriminated against for being different.

64.    In light of the numerous unanswered prior complaints, Mr. Henry feared retaliation by his co-workers and supervisors, and believed that Meijer would once again fail to address his race harassment and discrimination complaint.

7

65.     As a result, Mr. Henry emailed Mr. Ellsworth a few days later and on November 11, 2018, advising Mr. Ellsworth that he did not want to "file anything against [his] coworkers" because he did not want to "get anyone in trouble."

66.     Mr. Ellsworth asked Mr. Henry to submit a statement "as to why he feels like he is in a hostile work environment and he is being discriminated against", and also to "write a statement as to why he per his e-mail wanted to drop the complaint."

67.     On November 13, 2018, Mr. Henry provided a written statement for the express purpose of objecting to the hostile work environment, which states in relevant part: "I am writing this statement because I do not see the people that I have worked with treating anyone else like they treat me and it is creating a very hostile work environment."

68.     Mr. Henry's November 13, 2018 written statement objects to the race discrimination, harassment, and hostile work environment he was made to endure, and also states:

> **One of the mechanics asked me to go for a ride in the maintenance truck and there was a noose hanging from mirror of the truck in front of where I was sitting in August 2017 and I took a picture of it with my camera phone**…**I could not handle the stress and started having seizures because of the stress from seeing the noose and the harassment and had to go off work for six months**. When I came back to work in October of 2018 I ended up getting chosen out of all the other mechanics to hang up netting in the freezer by myself. Robert Bullard . . . told me that I was here for his punishment . . . It created a very hostile environment. I finally **asked him if he was racist because he does not treat me like he treats everyone else.** I told (Jeff Webster) that I feel discriminated against by the way him and Bullard treat me and I would like them to treat me like they treat everyone else .

(emphasis added).

69.     Mr. Henry's November 13, 2018 statement also advised Mr. Ellsworth that Mr. Carter refused to train him and he was treated differently and worse.

70.     Mr. Henry's November 13, 2018 statement also advised Mr. Ellsworth that Mr. Palomba witnessed the manner in which Mr. Henry was mistreated and asked him if he wanted to submit a complaint to Mr. Pektunus.

71.     Mr. Henry's November 13, 2018 statement also advised Mr. Ellsworth that Mr. Henry dropped the issue after speaking with Mr. Pektunus and "just started trying to take the abuse the best I could because the horrible treatment continued".

72.     Mr. Henry's November 13, 2018 statement objectively reveals that Mr. Henry submitted a complaint about repeated abusive discrimination treatment based on his race.

73.     Defendants did not conduct an investigation concerning race discrimination/retaliation, harassment or hostile work environment in response to Mr. Henry's November 13, 2018 statement.

74.     Defendants did not interview Mr. Henry after he submitted the November 13, 2018 complaint.

75.     Defendants did not even ask to see the picture of the noose he referenced.  **Ex. A.**

76.     Defendants have a duty to investigate known complaints of harassment or discrimination once they have received notice of the existence of harassment or discrimination in the work place.

77.     Defendants did not address the hostile work environment Mr. Henry was made to endure.

78.     Recognizing the fact that further complaints would likewise go unanswered, and because he was fearful for his safety, Mr. Henry was constructively discharged from his employment with Defendants, and submitted a polite letter concerning same.

79.    The offer Mr. Henry accepted for subsequent employment was for less money than what Mr. Henry was making working for Defendants.

80.    Plaintiff attempted to rescind his involuntary resignation, but Defendants denied this request.

81.    Mr. Henry was qualified for the positions he held with Defendants at all times during his employment.

82.    Defendants discriminated against, harassed, and made Mr. Henry endure a hostile work environment because of his race.   Defendants also retaliated against Mr. Henry, and subjected him to a retaliatory hostile work environment.

83.    On or about March 9, 2020, Mr. Henry passed away.

84.    On March 31, 2021, Plaintiff Lauretta Henry—Mr. Henry's wife—was appointed Personal Representative of the Estate of James Henry by the Ingham County Probate Court.

## COUNT I
## HARASSMENT BY DEFENDANTS
## IN VIOLATION OF 42 U.S.C. § 1981

85.    Plaintiff realleges and adopts the allegations contained in paragraphs 1-84, as if fully set forth herein.

86.    Mr. Henry subjected to verbal and/or physical conduct of a harassing nature because of his race.

87.    This harassing conduct was unwelcome.

88.    This harassing conduct was sufficiently severe or pervasive to alter the conditions of Mr. Henry's employment and create an intimidating, hostile, offensive, or abusive working environment.

89.     Mr. Henry faced multiple adverse employment actions as a result of the racial harassment he faced, including, but not limited to:

        a.      Denial of promotions;

        b.      Denial of training for promotions;

        c.      The accumulation of credit for retirement;

        d.      Seniority;

        e.      Vacation time;

        f.      Raises;

        g.      Benefits;

        h.      A constructive discharge;

        i.      An otherwise hostile work environment based on race; and

        j.      Denial of Mr. Henry's request to rescind his involuntary resignation.

90.     Mr. Henry was treated less favorably than similarly situated employees who were not African-American.

91.     The actions of Defendants as alleged above had the purpose and effect of denying Mr. Henry the same right to make and enforce contracts as is enjoyed by white citizens because he was an African-American, in violation of Mr. Henry's rights under 42 U.S.C. § 1981.

92.     The actions of Defendants as alleged above were intentionally and purposefully done to Mr. Henry because he was an African-American.

93.     As a direct, natural, proximate and foreseeable result of Defendants' harassment, Mr. Henry suffered past and future pecuniary losses, emotional pain and suffering, inconvenience, mental anguish, loss of enjoyment of life, the ultimate loss of his life, and other nonpecuniary losses.

94.    The actions of Defendants were in willful and wonton disregard of the rights of Mr. Henry so as to entitle Plaintiff to an award of punitive damages against Defendants to punish them for its conduct and to deter it and others from such conduct in the future.

95.    Plaintiff is entitled to recover reasonable attorney's fees and litigation expenses pursuant to 42 U.S.C. § 1988.

96.    Mr. Henry, having been harassed by Defendants, has suffered irreparable harm for which there is no plain, adequate or complete remedy at law.

**COUNT II**
**DISCRIMINATION BY DEFENDANTS**
**IN VIOLATION OF 42 U.S.C. § 1981**

97.    Plaintiff realleges and adopts the allegations contained in paragraphs 1-84, as if fully set forth herein.

98.    Mr. Henry was discriminated against by Defendants because he was an African-American.

99.    Mr. Henry faced multiple adverse employment actions because he was an African-American, including, but not limited to:

    a.    Denial of promotions;

100.    Denial of training for promotions;

    b.    The accumulation of credit for retirement;

    c.    Seniority;

    d.    Vacation time;

    e.    Raises;

    f.    Benefits;

    g.    A constructive discharge;

      h.      An otherwise hostile work environment based on race; and

      i.      Denial of Mr. Henry's request to rescind his involuntary resignation.

101.    Mr. Henry was treated less favorably than similarly situated employees who were not African-American.

102.    The actions of Defendants as alleged above had the purpose and effect of denying Mr. Henry the same right to make and enforce contracts as is enjoyed by white citizens because he was an African-American, in violation of Mr. Henry's rights under 42 U.S.C. § 1981.

103.    The actions of Defendants as alleged above were intentionally and purposefully done to Mr. Henry because he was an African-American.

104.    As a direct, natural, proximate and foreseeable result of Defendants' discrimination, Mr. Henry suffered past and future pecuniary losses, emotional pain and suffering, inconvenience, mental anguish, loss of enjoyment of life, the ultimate loss of his life, and other nonpecuniary losses.

105.    The actions of Defendants were in willful and wonton disregard of the rights of Mr. Henry so as to entitle Plaintiff to an award of punitive damages against Defendants to punish them for its conduct and to deter it and others from such conduct in the future.

106.    Plaintiff is entitled to recover reasonable attorney's fees and litigation expenses pursuant to 42 U.S.C. § 1988.

107.    Mr. Henry, having been discriminated against by Defendants, has suffered irreparable harm for which there is no plain, adequate or complete remedy at law.

**COUNT III**
**RETALIATION BY DEFENDANTS**
**IN VIOLATION OF 42 U.S.C. § 1981**

108.    Plaintiff realleges and adopts the allegations contained in paragraphs 1-84, as if fully set forth herein.

109.    Mr. Henry was retaliated against by Defendants because of his complaints about racial discrimination and harassment.

110.    Mr. Henry faced multiple adverse employment actions in retaliation for his complaints about racial discrimination and harassment, including, but not limited to:

a.    Denial of promotions;

b.    Denial of training for promotions;

c.    The accumulation of credit for retirement;

d.    Seniority;

e.    Vacation time;

f.    Raises;

g.    Benefits;

h.    A constructive discharge;

i.    An otherwise hostile work environment and retaliatory hostile work environment based on race; and

j.    Denial of Mr. Henry's request to rescind his involuntary resignation.

111.    Mr. Henry was treated less favorably than similarly situated employees who did not complain about racial discrimination and harassment.

112.    Mr. Henry was retaliated against by Defendants because he complained about racial discrimination and harassment.

113.     The actions of Defendants as alleged above had the purpose and effect of denying Mr. Henry the same right to make and enforce contracts as is enjoyed by white citizens because he was an African-American, in violation of Mr. Henry's rights under 42 U.S.C. § 1981.

114.     The actions of Defendants as alleged above were intentionally and purposefully done to Mr. Henry because he complained about racial discrimination and harassment.

115.     As a direct, natural, proximate and foreseeable result of Defendants' harassment, Mr. Henry suffered past and future pecuniary losses, emotional pain and suffering, inconvenience, mental anguish, loss of enjoyment of life, the ultimate loss of his life, and other nonpecuniary losses.

116.     The actions of Defendants were in willful and wonton disregard of the rights of Mr. Henry so as to entitle Plaintiff to an award of punitive damages against Defendants to punish them for its conduct and to deter it and others from such conduct in the future.

117.     Plaintiff is entitled to recover reasonable attorney's fees and litigation expenses pursuant to 42 U.S.C. § 1988.

118.     Mr. Henry, having been retaliated against by Defendants, has suffered irreparable harm for which there is no plain, adequate or complete remedy at law.

### COUNT IV
### HARASSMENT BY DEFENDANTS IN
### VIOLATION OF THE ELLIOT-LARSEN CIVIL RIGHTS ACT

119.     Plaintiff realleges and adopts all pertinent parts of paragraphs 1-84 as if set forth herein.

120.     Mr. Henry subjected to verbal and/or physical conduct of a harassing nature because of his race.

121.     This harassing conduct was unwelcome.

122.    This harassing conduct was sufficiently severe or pervasive to alter the conditions of Mr. Henry's employment and create an intimidating, hostile, offensive, or abusive working environment.

123.    Mr. Henry faced multiple adverse employment actions as a result of the racial harassment he faced, including, but not limited to:

        a.    Denial of promotions;

        b.    Denial of training for promotions;

        c.    The accumulation of credit for retirement;

        d.    Seniority;

        e.    Vacation time;

        f.    Raises;

        g.    Benefits;

        h.    A constructive discharge;

        i.    An otherwise hostile work environment based on race; and

        j.    Denial of Mr. Henry's request to rescind his involuntary resignation.

124.    Mr. Henry was treated less favorably than similarly situated employees who were not African-American.

125.    Mr. Henry was harassed by Defendants because he was an African-American.

126.    The actions of Defendants as alleged above were intentionally and purposefully done to Mr. Henry because he was an African-American.

127.    As a direct, natural, proximate and foreseeable result of Defendants' harassment, Mr. Henry suffered past and future pecuniary losses, emotional pain and suffering,

inconvenience, mental anguish, loss of enjoyment of life, the ultimate loss of his life, and other nonpecuniary losses.

128.    Plaintiff is entitled to recover reasonable attorney's fees and litigation expenses pursuant to MCL § 37.2802

129.    Mr. Henry, having been harassed by Defendants, has suffered irreparable harm for which there is no plain, adequate or complete remedy at law.

**COUNT V**
**DISCRIMINATION BY DEFENDANTS IN**
**VIOLATION OF THE ELLIOT-LARSEN CIVIL RIGHTS ACT**

130.    Plaintiff realleges and adopts all pertinent parts of paragraphs 1-84 as if set forth herein.

131.    Mr. Henry was discriminated against by Defendants because he was an African-American.

132.    Mr. Henry faced multiple adverse employment actions as a result of the racial discrimination he faced, including, but not limited to:

      a.    Denial of promotions;

      b.    Denial of training for promotions;

      c.    The accumulation of credit for retirement;

      d.    Seniority;

      e.    Vacation time;

      f.    Raises;

      g.    Benefits;

      h.    A constructive discharge;

      i.    An otherwise hostile work environment based on race; and

j.    Denial of Mr. Henry's request to rescind his involuntary resignation.

133.    Mr. Henry was treated less favorably than similarly situated employees who were not African-American.

134.    Mr. Henry was discriminated against by Defendants because he was an African-American.

135.    The actions of Defendants as alleged above were intentionally and purposefully done to Mr. Henry because he was an African-American.

136.    As a direct, natural, proximate and foreseeable result of Defendants' harassment, Mr. Henry suffered past and future pecuniary losses, emotional pain and suffering, inconvenience, mental anguish, loss of enjoyment of life, the ultimate loss of his life, and other nonpecuniary losses.

137.    Plaintiff is entitled to recover reasonable attorney's fees and litigation expenses pursuant to MCL § 37.2802

138.    Mr. Henry, having been discriminated against by Defendants, has suffered irreparable harm for which there is no plain, adequate or complete remedy at law.

**COUNT VI**
**RETALIATION BY DEFENDANTS IN**
**VIOLATION OF THE ELLIOT-LARSEN CIVIL RIGHTS ACT**

139.    Plaintiff realleges and adopts all pertinent parts of paragraphs 1-84 as if set forth herein.

140.    Mr. Henry was retaliated against by Defendants because he complained about racial discrimination and harassment.

141.    Mr. Henry faced multiple adverse employment actions in retaliation for his complaints about racial discrimination and harassment. including, but not limited to:

a.  Denial of promotions;

b.  Denial of training for promotions;

c.  The accumulation of credit for retirement;

d.  Seniority;

e.  Vacation time;

f.  Raises;

g.  Benefits;

h.  A constructive discharge;

i.  An otherwise hostile work environment and retaliatory hostile work environment based on race; and

j.  Denial of Mr. Henry's request to rescind his involuntary resignation.

142.  Mr. Henry was treated less favorably than similarly situated employees who did not complain about racial discrimination and harassment.

143.  Mr. Henry was retaliated against by Defendants because he because he complained about racial discrimination and harassment.

144.  The actions of Defendants as alleged above were intentionally and purposefully done to Mr. Henry because he complained about racial discrimination and harassment.

145.  As a direct, natural, proximate and foreseeable result of Defendants' retaliation, Mr. Henry suffered past and future pecuniary losses, emotional pain and suffering, inconvenience, mental anguish, loss of enjoyment of life, the ultimate loss of his life, and other nonpecuniary losses.

146.  Plaintiff is entitled to recover reasonable attorney's fees and litigation expenses pursuant to MCL § 37.2802

147.    Mr. Henry, having been retaliated against by Defendants, has suffered irreparable harm for which there is no plain, adequate or complete remedy at law.

**COUNT VII – INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**

148.    Plaintiff realleges and incorporates paragraphs 1-84 herein.

149.    The conduct complained of was outside the conduct expected to exist in the workplace, was intentional and malicious and done to cause Mr. Henry to suffer humiliation, mental anguish, and emotional and physical distress.

150.    In confirming and ratifying the complained of conduct, Defendants' conduct was done with the knowledge that Mr. Henry's emotional and physical distress would thereby increase, and was done with a wanton and reckless disregard of the consequences to Plaintiff.

151.    As a proximate result of Defendants' conduct and by their intentional infliction of emotional distress as alleged herein, Mr. Henry has been harmed in that Mr. Henry has suffered humiliation, mental anguish, loss of enjoyment of life, the ultimate loss of his life and emotional and physical sickness, and has been injured in mind and health.

152.    As a result of said distress and consequent harm, Mr. Henry has suffered such damages in an amount proven at time of trial.

153.    Defendants authorized, ratified, knew of the wrongful conduct complained of herein, but failed to take immediate and appropriate corrective action to remedy the situation, and engaged in further wrongful conduct, thereby acted fraudulently, maliciously, oppressively and with reckless disregard of Mr. Henry's rights and safety, and thereby entitling Plaintiff to an award of exemplary damages.

**COUNT VIII – NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS**

154.    Plaintiff realleges and incorporates paragraphs 1-84 and 147-152 herein.

155.    In the alternative, if said conduct of Defendant, and each of them, and their agents and employees was not intentional, it was negligent, and Plaintiff is thereby entitled to general damages and all other damages available for the negligent infliction of emotional distress.

**REQUEST FOR RELIEF**

WHEREFORE, Plaintiff prays for damages in an amount to be determined at trial, together with interest, cost of suit, attorneys' fees, and all such other relief as the court deems just and proper which include:

a.    Declare that the aforementioned practices and actions of Defendants constitute unlawful employment practices in violation of 42 U.S.C. § 1981, and the ELCRA;

b.    Award Plaintiff all lost wages, benefits and other monetary damages to which she is entitled to including interest under 42 U.S.C. § 1981, and the ELCRA, and for IIED and NIED;

c.    Award Plaintiff compensatory damages under 42 U.S.C. § 1981 and the ELCRA, and for IIED and NIED;

d.    Award Plaintiff exemplary damages under ELCRA , and for IIED and NIED;

e.    Award Plaintiff punitive damages under 42 U.S.C. § 1981;

f.    Award Plaintiff reasonable attorney's fees, costs, and interest under 42 U.S.C. § 1981, and the ELCRA;

g.    Award Plaintiff equitable relief including, but not limited to: an injunction directing Defendants to cease their discriminatory conduct and practices and injunctive relief directing Defendants to immediately provide all employees

with a safe, non-discriminatory work environment under 42 U.S.C. § 1981 and the

ELCRA; and

      h.     Award Plaintiff all other relief available under ELCRA and 42 U.S.C.

§ 1981, and for IIED and NIED, as well as any other relief the Court deems just and

proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury on all issues so triable.


Respectfully submitted this 8th day of July, 2021.

                             **MORGAN & MORGAN, P.A.**

                             By: */s/ Michael N. Hanna*
                                 **MICHAEL N. HANNA (P81462)**
                               **WARREN D. ASTBURY (P82416)**
                               Attorney for Plaintiff
                               2000 Town Center
                               Suite 1900
                               Southfield, MI  48075
                               Tel:  (313) 251-1399
                               mhanna@forthepeople.com
                               wastbury@forthepeople.com